UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | | |
|---|---|---|
| LORRAINE MEADE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:10-CV-00102-JD |
| | ) | |
| KROGER LIMITED PARTNERSHIP I, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Now before the Court is Defendant's Motion for Summary Judgment filed on May 20, 2011. DE 18-20.  Plaintiff responded on June 19, 2011. DE 21, 22.  Defendant replied on July 6, 2011. DE 23.  For the following reasons, Defendant's Motion for Summary Judgment is GRANTED.

## I.  BACKGROUND

Plaintiff, Lorraine Meade ("Meade"), began employment with Defendant Kroger Limited Partnership I ("Kroger") in November, 2001.  DE 20-1 at 6.[1]  Throughout her employment with Kroger, Meade was represented by the Union Food & Commercial Workers, Local Union 700 ("union"). *Id.* at 23, 26.  Meade was born in 1955, making her forty-six years old at the time of her hire and fifty-two years old at the time of her termination–the adverse action which Meade alleges was discriminatory. DE 1 at 1; DE 22 at 1.

### A.    Meade's Employment with Kroger in Indianapolis, Indiana

Kroger initially hired Meade to work in the office at a store in the Indianapolis area. DE 20-1 at 6.  Meade was promoted twice, first to assistant head cashier and subsequently to the

---

[1]Pinpoint citations to the record refer to the page of the PDF document.

head cashier position. *Id.* at 7. While working in these positions, Meade performed the duties of a cashier. *Id.*

At her deposition, Meade acknowledged that, as a cashier, she understood that customer service was an essential part of her job duties which required her to greet customers, respond to their questions, explain store policies, and deal with customers in a courteous and tactful manner. DE 20-1 at 9-13. Meade admitted that when she was hired, she signed a document which required her to be courteous to customers and that her job depended on customers. DE 20-1 at 12-13; DE 20-4 at 22. Meade was aware, having signed the rules and regulations, that being discourteous to customers or fellow employees would result in disciplinary action ranging from reprimand to immediate termination of employment depending on the seriousness of the offense and the judgment of management. DE 20-1 at 13-15, 18-19; DE 20-4 at 18-19. Meade was aware of and understood Kroger's "Customer First" strategy, and received customer service training during her employment with Kroger. DE 20-1 at 17-20; DE 20-5.

On October 6, 2002, Meade received a written Constructive Advice Record ("CAR"), which get signed by a store manager or supervisor, indicating that a customer complained on October 1 that Meade was rude, although Meade disagreed with the customer's characterization of the events. DE 20-1 at 64-67; DE 20-6. Kroger believed the customer and as a result of the complaint, Melissa Ruse placed Meade on thirty days probation (until November 6, 2002), and Meade was advised that she needed to work on her customer service skills and be "friendlier to everyone." *Id.*

On July 14, 2003, it was reported that another customer complained that Meade argued with her over the price of a bag of chips, and then the chips were thrown after being rung up. DE

20-1 at 67-69; DE 20-7. Meade said the report was untruthful, but Kroger believed the customer. *Id*. A CAR was issued with the customer's handwritten complaint attached to it. *Id*. Meade was warned that she needed to be courteous to all customers, that further occurrences may result in further discipline including indefinite suspension,[2] and she was again placed on thirty days probation (until August 16, 2003). *Id*.

On February 5, 2004, it was reported that another customer complained that Meade was rude to him and co-workers. DE 20-1 at 70-73; DE 20-8. Co-manager Nicole Grubbs issued Meade her third CAR, instructed Meade to complete customer service training again, placed her on probation for sixty days (until April 7, 2004), and warned her that further occurrences would lead to disciplinary action including discharge. *Id*. Meade thought the incident was exaggerated and did not warrant her being written-up. *Id*.

On April 12, 2004, another customer complained that Meade was "rude" and "disrespectful" which was documented as being witnessed by "L.B." DE 20-1 at 73-75, 79; DE 20-9. Meade thought the complaint was "vague," but again a CAR was issued and Mead was placed on probation by Barb Reen [sic], this time for ninety days (until July 12, 2004). *Id*. Meade was again warned that future incidents of this nature would lead to her indefinite suspension. *Id*.

---

[2]Marcie Duley, a Labor Relations Specialist employed by Kroger, explained in her affidavit that indefinite suspension is:

> [A] term of art used by Kroger with respect to its unionized employees. Because these employees have the right to file a grievance about any termination, Kroger indefinitely suspends union employees, rather than simply terminating them. If an employee is placed on indefinite suspension and does not file a grievance, than the employee is officially terminated. If the employee does file a grievance, he or she remains on indefinite unpaid suspension until the grievance is resolved. If the employee ultimately is not reinstated, then the employee is officially terminated.

DE 20-17 at 2-3.

On April 22, 2004, the Kroger Call Center received another customer complaint about Meade's behavior indicating that even though Meade was one of the front line supervisors, she was very rude and embarrassed the customer who was trying to pay with a check. DE 20–1 at 76-80; DE 20-10. Meade could have been indefinitely suspended because she was already on probation at the time of this incident, but instead her ninety day probationary period was extended until July 26, 2004 by Barb Reen [sic], per the CAR. *Id.* Again Meade was warned that future incidents of this nature could result in indefinite suspension. *Id.*

In September 2004, the store received an additional complaint about the store being short-staffed and Meade's being "hateful" to her coworkers. DE 20-1 at 80-81; DE 20-11. In September, 2005, the store received another complaint about Meade, with the customer calling Meade "the rudest, most hateful, unfriendly employee I've ever run across in this store . . .[and] [s]he is never nice to the cashiers, will yell at them in front of customers. Very unprofessional." DE 20-1 at 81-83; DE 20-12.

**B.      Meade's Transfer to the Kroger Store in Plymouth, Indiana**[3]

In August 2006, Meade requested to be transferred from the Kroger store in Indianapolis, Indiana to a store location in Plymouth, Indiana because she had moved to Culver, Indiana. DE 20-1 at 21-24; DE 20-13. Though the record indicates that Meade was in consideration for a head cashier position at the LaPorte, Indiana location, ultimately she was given a cashier

---

[3]At the Plymouth, Indiana Kroger's store, the management structure was as follows: Alex Redenius was the District 5 Operations Director who served as the direct supervisor of Plymouth store managers, including Tonya Hurley, DE 20-28 at 2; and, Kevin Paluszewski and William (Bill) Deeter, along with others identified by stipulated records to be discussed, were co-managers that were directly supervised by Plymouth store manager Tonya Hurley, and co-managers directly supervised and disciplined cashiers, including Meade. DE 20-21 at 2; DE 20-22 at 2.

position at the Plymouth, Indiana store, which was managed by Tonya Hurley.[4] DE 20-1 at 27-31. Meade believed that she was given the cashier position (instead of the head or assistant head cashier position), was scheduled to begin work a week later than expected (September 10, 2010), and was thereafter Hurley's target, because Hurley was upset about Meade's attempt to work at the LaPorte store. DE 1 at 2-3; DE 20-1 at 28-33; DE 22 at 2. Meade believes that at this point in time, Hurley began treating Meade with disrespect and "more negatively" than she treated younger employees. DE 1 at 3. At the time, Hurley was fifty-one years old, one year older than Meade. DE 20-14 at 2; DE 22 at 1.

In December 2006, Meade was evaluated by a secret shopper. DE 20-1 at 62-63; DE 20-15. As a result, on January 5, 2007, Hurley issued a CAR indicating that the mystery shopper went through Meade's lane but Meade "did not greet, acknowledge, thank, make eye contact, smile, ask for plus card, or check the bottom of the [shopping cart]." *Id.* Meade disputed these events, but Kroger believed the mystery shopper over Meade and placed Meade on probation until March 5, 2007. *Id.* The CAR indicated that Meade's being indifferent to customers would not be tolerated and her failure to comply could result in further disciplinary action including indefinite suspension. *Id.*

On January 7, 2008, another customer complained about Meade's unhelpful attitude, but Meade denies that the incident occurred. DE 20-1 at 54, 61; DE 20-16 at 2. As a result of the complaint, Meade was once again placed on 60 days of probation (until March 7, 2008), which

---

[4]Per Meade, Tonya Hurley was eventually terminated for cause by Kroger, sometime after Meade's termination. DE 22 at 2.

5

Hurley signed. *Id.* Meade was also warned by Kevin Paluszewski[5] that if she exhibited any "rude" or "insubordinate" behavior toward management, she would be subject to indefinite suspension. DE 20-21 at 3; DE 20-16 at 3.

On March 4, 2008, Kroger issued Meade two CAR's signed by Hurley. DE 20-1 at 56-61; DE 20-18; DE 20-19. The CAR's report that Meade took a long lunch on February 24, clocked out and left work before the end of her shift on February 29, and on March 1 she took two extended breaks, turned her check lane light off before the end of her shift even though she still had customers in line, and then argued with the supervisor in front of customers when she was instructed to turn her light back on. *Id.* Meade disputes that these events took place, however Meade's probation was extended for another sixty days (until May 4, 2008). *Id.* The CAR indicated that Meade was to return from breaks on time, work her full shift, offer customer service to all customers, and do as her supervisor instructs her to do, and that her failure to comply could result in further disciplinary action including indefinite suspension. *Id.*

On May 2, 2008, Ashley Blair, another Kroger employee, spoke to a customer on the phone who complained about Meade's being "rude and argumentative." DE 20-1 at 45-52; DE 20-20 at 3; DE 20-21 at 2-3, 5. Blair reported that Meade argued with the customer about the price of a box of cereal and refused to have the shelf tag checked to verify the price. *Id.* When Blair asked if the customer wanted to talk to a manager, the customer said he would come back to the store later. *Id.* The next day, the customer came into the store and repeated his complaint

---

[5]Kevin Paluszewski was a co-manager at the Kroger's store in Plymouth, Indiana from October 2007 until July 2010, at which time he became the District 5 Produce Coordinator. DE 20-21 at 2.

to William Deeter, one of the store's co-managers.[6] DE 20-22 at 2-3. Meade did not agree with the customer's characterization of her behavior, but Kroger did. DE 20-1 at 47; DE 20-21 at 3; DE 20-22 at 2-3. Meade was still on probation from the March CAR's, and therefore on May 10, 2008, Hurley and Paluszewski decided to place Meade on indefinite suspension. DE 20-1 at 84; DE 20-20 at 2; DE 20-21 at 3. On May 5, 2008, Bill Deeter also received a complaint from a co-worker about Meade yelling at the co-worker in a rude manner in front of customers. DE 20-22 at 3, 5.

During her deposition, Meade admitted that she had no knowledge of other CAR's that were given by Kroger to other front end employees, and that she was unaware of anyone else at the Plymouth store who had as many CAR's for customer complaints as she had accumulated at the store. DE 20-1 at 63-64.

Pursuant to the Union's Collective Bargaining Agreement with Kroger, Meade filed a grievance dated May 12, 2008, arguing that her indefinite suspension was without proper cause. DE 20-1 at 84; DE 20-17 at 3; DE 20-23 at 5; DE 20-24. The grievance included no claim of age discrimination. Ultimately, after union representatives and Duley[7] discussed Meade's grievance, the grievance was settled, and on June 28, 2008, Duley wrote a letter to union representative Scott Barnett which indicated that "[i]n the spirit of cooperation and harmony" Meade's employment would be reinstated as a cashier on a "last chance basis." DE 20-1 at 86-87; DE 20-17 at 3, 7; DE 20-25. "Last chance basis" meant that if Meade received any further customer

_____

[6]William Deeter was a co-manager at the Kroger Plymouth, Indiana store from August 2007 until October 2008, but has been employed by Kroger continuously since June 2007. DE 20-22 at 2.

[7]As Kroger's Labor Relations Specialist since August 2007, Marci Duley was charged with the responsibility of representing Kroger when employees represented by the union filed grievances challenging Kroger's employment actions. DE 20-17 at 2.

complaints then Meade could be indefinity suspended which was the first step of termination. DE 20-17 at 3. Meade returned to work sometime around the Fourth of July holiday in 2008. DE 20-1 at 87; DE 20-21 at 3.

On July 30, 2008, Meade took a check from a customer for an order of $319.32; however, because the customer wrote the check out for $329.32, Meade should have given the customer ten dollars in change, but Meade inadvertently gave the customer twenty dollars in change. DE 20-1 at 89; DE 20-21 at 3; DE 20-26.  Upon realizing her mistake, Meade immediately reported it to her supervisor, Michelle Daniels, who balanced Meade's cash register drawer because it was nearing the end of Meade's shift, and the ten dollar shortage was confirmed. DE 1 at 3. Meade and three front-end supervisors (Michelle Daniels, Heidi Fugate, and Yvonne Watkins) attempted to reach the customer by telephone to rectify the situation, but they were not successful. *Id.*

Kevin Paluzewski decided to suspend Meade for one day as a result of the cash register shortage and based on his understanding of her last chance agreement. DE 1 at 3; DE 20-21 at 3. Meade's co-worker, Doug Aurand, witnessed Paluzewski suspend Meade. DE 1 at 3. Paluzewski issued a CAR dated August 1, 2008 documenting the incident, and his decision to suspend Meade for one day and place her on probation. DE 20-1 at 89-90; DE 20-21 at 3; DE 20-26.

Learning of Meade's suspension, Scott Barnett contacted Duley to inform her of the suspension. DE 20-17 at 3.  Duley then contacted Paluzewski, and informed him that his understanding of the last chance agreement was erroneous. DE 20-17 at 3; DE 20-21 at 3.  Duley then informed Barnett that Mead's suspension was being rescinded and that Meade would be

paid for the missed work day. DE 20-1 at 90; DE 20-17 at 3; DE 20-21 at 3. After her suspension was rescinded, Meade does not recall receiving even a written warning from the incident, and no one communicated to Meade whether she remained subject to the last chance basis—the condition that was imposed when her employment was reinstated on June 28, 2008. DE 22 at 3.

Barnett informed Meade that a younger employee, Kayla (who Meade identifies as a younger similarly situated cashier), had left cash and checks on the top of her cash register which were found by the next cashier, and that Kayla received a written warning. DE 1 at 3; DE 20-1 at 91; DE 22 at 3.

### C. The August 14, 2008 Incident Leading to Meade's Indefinite Suspension and Termination

On August 14, 2008, another CAR was issued by Hurley indicating that a customer complained about Meade. DE 20-1 at 92-95; DE 20-27. On that morning, Meade was assigned to work in the U-Scan self-service checkout lane when, at approximately 8:35 a.m., two customers experienced difficulty when trying to check out with insufficient funds on a food stamp card. DE 1 at 4-5; DE 20-1 at 92-95; DE 20-27. At one point during her interaction with the customers, one of the customers told Meade, "You don't have to be rude." *Id*. Meade did not think she had been rude to the customer, but she apologized to the customer. DE 1 at 4-5; DE 20-1 at 95. The customers filled out a comment card indicating that Meade was rude, and that they were disappointed with the friendliness and attentiveness of the store's employees. DE 20-1 at 96-97; DE 20-28 at 3, 6.

On that same day, Alex Redenius, Kroger's District Operations Director and Hurley's direct supervisor, was in the Plymouth store in connection with his normal duties. DE 20-28 at 2. Because Redenius has the regular duty to contact customers who submit a written complaint, in accordance with Kroger's standard practice he called to speak with the customers about the incident. *Id.* at 2-3, 6. When Redenius reached one of the customers, she told him that Meade had treated them disrespectfully and used a harsh tone. *Id.* at 3. The customer also said that when they asked for help with the U-Scan, Meade told them that they should not have come through that line if they did not know how to use the U-Scan. *Id.*

After speaking with the customer, Redenius asked Kroger employees Robert McCoige and Ashley Hughes, who worked on August 14, to provide written statements of their interactions with the customers that morning. DE 20-28 at 3, 7-10. Hughes indicated that she saw two customers having trouble near the U-Scan. DE 20-28 at 10. According to Hughes's written statement, the female customer asked to speak with a manager and said that the employee assisting them [Meade] "was of no assistance" and "had a really bad attitude." *Id*. Meade did not seem to care that the customers were having difficulties until one of them asked to speak to a manager, at which time Meade began to apologize. *Id.*

Robert McCoige[8] was moving shopping carts in the parking lot when he heard two upset customers loudly exiting the store. DE 20-28 at 8; DE 20-29 at 1-2. According to McCoige's written statement and affidavit, McCoige heard the two customers saying that someone should let the manager know about the rude people working there. DE 20-28 at 8; DE 20-29 at 2-3.

---

[8]Robert (Bob) McCoige provided a separate affidavit indicating that he is a cashier and courtesy clerk at the Kroger's store in Plymouth and has worked at that store since November 2000. DE 20-29 at 1.

McCoige then asked the customers what was wrong, to which the customers responded by telling McCoige in explicit terms that the U-Scan cashier had been rude, loud, and gave them a very hard time. *Id*. At this point, McCoige offered to give the customers a comment card so that they could submit their complaint in writing. DE 20-29 at 3. McCoige had offered comment cards to other customers in the past, and he decided to offer a comment card to these customers because they were so upset and he wanted to fulfill his duty to provide excellent customer service on behalf of Kroger. *Id.* Although McCoige said that no one instructed him to give the customers a comment card, DE 20-29 at 3; Meade was told that someone had so instructed him, but she did not know who gave the instruction.[9] DE 1 at 4-5; DE 20-1 at 98-100. McCoige said that the customers wanted to fill out a comment card, so he went inside the store and retrieved a blank card. DE 20-29 at 3. After the customers completed the comment card, McCoige "passed it up the chain of command." DE 20-29 at 3, 6. Thereafter, McCoige was contacted by Redenius, who requested that McCoige provide a written statement of his interaction with the customers. *Id.* at 3, 8. While Meade assumed that everyone knew about her last chance status, DE 20-1 at 101; McCoige attested that he did not know anything about Meade's disciplinary status or that she was subject to a last chance. DE 20-29 at 3-4.

After reading these statements and speaking with the customers, Redenius determined that the customer's complaint "accurately described their experience with Meade and that they were legitimately and reasonably upset with the way Meade had treated them." DE 20-28 at 3. As a result of this determination, Redenius decided to indefinitely suspend Meade. *Id.* In his

---

[9]Meade also testified that McCoige is one of Hurley's "favorites," and she thought that McCoige was in his thirties, DE 20-1 at 99; however, in August 2008, McCoige was forty-eight years old. DE 20-29 at 2.

affidavit, Redenius explained that his decision was based on the fact that Meade had received another customer complaint after being reinstated on a last chance basis, and his decision was not based on her age. *Id.* At the time of the incident, Redenius was forty-nine years old. *Id.* at 2.

Meade admitted that the interaction with the customers occurred and that the customers actually perceived Meade as being rude to them, so she apologized; however, she did not think it rose to "the level that they've made it out to be" and the customers walked out of the store making sure everyone knew that they were unhappy. DE 20-1 at 94-95, 97-98, 101. Meade could not remember if Tonya Hurley was present when the incident happened, but she believed that Hurley directed CAR's be given to Meade. DE 20-1 at 98, 101. In fact, Meade believed that Kroger always put the customer first and they did not care about their employees. DE 20-1 at 102.

## D.     Meade's Grievance Protesting the Indefinite Suspension

On August 14, 2008, the day of her indefinite suspension, Meade filed a grievance with the union arguing that her indefinite suspension was without proper cause. DE 20-1 at 100, 102-03; DE 20-30. The grievance included no claim of age discrimination. On August 29, 2008, a meeting was held to address the grievance, and present at the meeting was District Manager Steve Jenkins, Redenius, Duley, and Hurley. DE 20-17 at 3-4; DE 20-28 at 3. Union representative Scott Barnett was also in attendance, along with Meade. *Id.*; DE 20-1 at 105. Sometime following her indefinite suspension on August 14 and the meeting on August 29, Redenius and Duley were informed that another customer had complained to Deeter about Meade on August 13, 2008, indicating that Meade was rude to him when he tried to use a coupon to purchase the wrong size can of coffee—to which Meade commented on during the grievance

12

meeting that he was the "stupid coffee guy" and "customers are not God." DE 20-17 at 4; DE 20-22 at 3; DE 20-28 at 4.

In their affidavits, Redenius and Duley attested that based on their knowledge of Meade's past history of customer complaints, review of the documents related to the August 14 customer complaint, and Meade's statements at the grievance meeting, they believed that the August 14 complaint about Meade was accurate and that Meade simply could not or would not live up to the customer service standards required by Kroger. DE 20-17 at 4; DE 20-28 at 4. Following the meeting, Redenius, Jenkins, and Duley discussed the grievance and unanimously agreed that Meade should not be reinstated and that her grievance should be denied, based on Meade's "demonstrated inability to live up to Kroger's customer service standards, not her age."[10] *Id.*

Meade's employment with Kroger was officially terminated as of the date of the grievance meeting, August 29, 2008. DE 20-17 at 5. On September 15, 2008, Duley drafted a letter to Barnett indicating that Meade received a customer complaint on August 14, 2008 after having been brought back to work "on last chance for customer complaints," that "Meade's actions cannot be tolerated," and that her grievance was denied. DE 20-1 at 104; DE 20-17 at 5, 15; DE 20-31. On September 30, 2008, Scott Barnett informed Meade that after reviewing the company's decision, her grievance would not be pursued to arbitration. DE 20-1 at 106-08; DE 20-32. Meade appealed the union's decision to the president, Joseph Chorpenning, on October 14, 2008. DE 20-1 at 108-09; DE 20-33. The Union Appeals' Committee reviewed the pending grievance and again declined to pursue the grievance. DE 20-1 at 109-10; DE 20-34.

---

[10]Kroger made the reference to age not being a factor in Kroger's affidavits, which were created after the grievance was resolved and after this lawsuit began. Meade never claimed in her May and August 2008 grievances that age was a factor in her being indefinitely suspended.

Meade commenced this action on March 25, 2010, for discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.* DE 1. During her deposition in relation to the lawsuit, Meade admitted that she does not know of any other Plymouth store employee who was not terminated after violating a last chance agreement, DE 20-1 at 104; she does not know who replaced her after she was fired and she did not know the person's age, *id.* at 104-05; prior to filing her EEOC charge on October 24, 2008, Meade never complained to anyone that Kroger discriminated against her on the basis of her age; *id.* at 111-12, 114; and despite Kroger's anti-discrimination policy (that Meade admitted receiving in 2001), despite the employee handbook which detailed a means to complain of discrimination (that Meade admitted receiving in 2006 and 2008), and despite Kroger's anti-discrimination agreement with the union (DE 20-23 at 30), Meade never used these avenues to file a complaint or grievance indicating that she felt discriminated against by Kroger on the basis of age, DE 20-1 at 112-13. Meade admitted that the only facts supporting her claim for retaliation is her belief that the customer complaint of August 14, 2008 was "staged" and therefore the basis of her termination (which she blames Hurley and ultimately Kroger for) was not valid. DE 1 at 6; DE 20-1 at 113-14. Meade also contends that she was satisfactorily performing her duties to Kroger's reasonable expectations, given that she received periodic raises throughout her employment with Kroger. DE 22 at 3.

## II. STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or

is genuinely disputed must support the assertion by:  citing to particular parts of materials in the record; or by showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact. Fed R. Civ. P. 56(c)(1).

The Court views the record in the light most favorable to Lorraine Meade and draws all reasonable inferences in her favor. *Blood v. VH-1 Music First,* No. 10-3729, 2012 WL 402046 *1 (7th Cir. Feb. 9, 2012) (citing *McCann v. Iroquois Mem'l Hosp.,* 622 F.3d 745, 752 (7th Cir. 2010)).  The Seventh Circuit has cautioned against weighing evidence at summary judgment, *Kodish v. Oakbrook Terrace Fire Prot. Dist.,* 604 F.3d 490, 507 (7th Cir. 2010), but it has also said that "a factual dispute is 'genuine' only if a reasonable jury could find for either party," *SMS Demag Aktiengesellschaft v. Material Scis. Corp.,* 565 F.3d 365, 368 (7th Cir. 2009). *VH-1 Music First,* 2012 WL 402046 *1.  "Summary judgment cannot be used to resolve swearing contests between litigants." *McCann*, 622 F.3d at 752 (citation omitted).

If the nonmoving party fails to establish the existence of an essential element on which it bears the burden of proof at trial, summary judgment is proper–even mandated. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (holding that a failure to prove one essential element to the party's case which it bears the burden of proof on "necessarily renders all other facts immaterial")).

## III.  DISCUSSION

Meade alleges that Kroger terminated her employment because of her age and retaliated against her in violation of the ADEA.  DE 1.

**A.      Meade's Claim for Discrimination in Violation of the ADEA**

The ADEA makes it illegal for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); *see Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167 (2009) ("The words 'because of' mean 'by reason of: on account of'. . . [t]hus, the ordinary meaning of the ADEA's requirement that an employer took adverse action 'because of' age is that age was the 'reason' that the employer decided to act.") (internal citations omitted).  To establish a violation of the ADEA, an employee must show that age actually motivated the adverse employment action. *Van Antwerp v. City of Peoria, Ill.,* 627 F.3d 295, 297 (7th Cir. 2010) (citing *Faas v. Sears, Roebuck & Co.,* 532 F.3d 633, 641 (7th Cir. 2008)). Put differently, age must have played a role in the employer's decision-making process and had a determinative influence on the outcome. *Id.* (citing *Schuster v. Lucent Techs., Inc.,* 327 F.3d 569, 573 (7th Cir. 2003)).

Unlawful discrimination under this statute may be proved through direct evidence of impermissible motive, or indirectly through the burden-shifting method outlined by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801-04 (1973). *Van Antwerp*, 627 F.3d at 297 (citing *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 695 (7th Cir. 2006)); *see Tubergen v. St. Vincent Hosp. and Health Care Ctr., Inc.*, 517 F.3d 470, 474 (7th Cir. 2008).

Under the direct method of proof, Meade can offer "direct evidence of animus–the so-called 'smoking gun'–or circumstantial evidence which establishes a discriminatory motive on the part of the employer through a longer chain of inferences."  *Van Antwerp*, 627 F.3d at 297 (citing *Mach v. Will County Sheriff,* 580 F.3d 495, 499 (7th Cir. 2009)).  Circumstantial evidence

16

can take many forms, including "suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group," evidence showing "that similarly situated employees outside the protected class received systematically better treatment," and "evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination." *Id.* (quoting *Sun v. Bd. of Trs.,* 473 F.3d 799, 812 (7th Cir. 2007)). Whatever circumstantial evidence is offered, however, must "point directly to a discriminatory reason for the employer's action." *Id*. (quoting *Adams v. Wal-Mart Stores, Inc.,* 324 F.3d 935, 939 (7th Cir. 2003)). Otherwise, the plaintiff must proceed by way of the indirect route.

Meade does not attempt to proceed under the direct method of proof. In fact, the record is barren of any direct evidence upon which to rationally infer that she was terminated on account of her age, and she does not present circumstantial evidence, such as suspicious timing, ambiguous oral or written statements, statistical evidence of disparate treatment, or evidence that similarly situated employees received systematically better treatment, which would establish a chain of inferences pointing directly to a discriminatory reason for Kroger's actions.

Because Meade cannot proceed under the direct method of proof, she must proceed under the indirect method, which requires her to establish four distinct elements of a *prima facie* case: (1) she is a member of a protected class; (2) she was performing at a level that met her employer's legitimate expectations; (3) she was subject to an adverse employment action; and (4) she was treated less favorably than other similarly situated employees who were not members of her protected class or were younger. *McDonnell Douglas,* 411 U.S. at 802; *Tubergen,* 517 F.3d at 475.

However, "[b]ecause unlawful discrimination can occur in a variety of employment contexts, '[the Seventh Circuit has] adapted the requirements for making a *prima facie* case in special cases to reflect the reality of the workplace.'" *Krchnavy v. Limagrain Genetics Corp.,* 294 F.3d 871, 875 (7th Cir. 2002) (quoting *Michas v. Health Cost Controls of Ill., Inc*., 209 F.3d 687, 693 (7th Cir. 2000) (age discrimination case)). *See also O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 983 (7th Cir. 2001) (noting that the *McDonnell Douglas* framework applies to both claims of age and sex discrimination). As a result, the showing necessary to establish differential treatment depends on the facts of the case.

1. *Prima Facie Case*

As a threshold matter, the evidence establishes the first and third elements of Meade's claim conclusively. There is no dispute that: (1) Meade was fifty-two years old, and is therefore within a protected class for purposes of the ADEA; and (2) on August 14, 2008, Meade was subject to an indefinite suspension and then subsequent termination on August 29, 2008–thus, she was subjected to an adverse employment action. Meade's *prima facie* case fails, however, on the two other elements: that she was meeting Kroger's legitimate work expectations and that she was treated less favorably than a similarly-situated employee.[11]

**a. Meade fails to establish that she was meeting Kroger's legitimate work expectations**

---

[11]Although the *prima facie* case is a flexible analysis that is altered to apply to differing factual situations, *McDonnell Douglas*, 411 U.S. at 802 n.13, and it has been held that a terminated employee can meet the fourth prong of the *prima facie* case by showing that after being terminated, the employee was replaced by someone outside of the protected class, *see Reeves v. Sanderson Plumbing Prods, Inc.*, 530 U.S. 133, 142 (2000); *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996); *Coco v. Elmwood Care, Inc.,* 128 F.3d 1177, 1179 (7th Cir. 1997); *Moser v. Tyson Foods, Inc.,* No. 3:07-CV-359, 2010 WL 1382118 (N.D. Ind. Mar. 29, 2010), the record contains no facts relative to events that transpired subsequent to Meade's termination. In fact, Meade testified that she had no idea who replaced her or if that person was the same age as her. DE 20-1 at 104-05. Therefore, Meade's claim cannot succeed on evidence of a younger replacement theory.

Meade has failed to establish that she was meeting Kroger's legitimate expectations at the time of her indefinite suspension and subsequent termination. Aside from the fact that throughout her employment with Kroger, Meade received written warnings dating back to July 14, 2003, indicating that Meade would be disciplined (which could include indefinite suspension or discharge) if she again violated Kroger's rules and regulations requiring her to be courteous to customers; Meade claims that she was meeting Kroger's reasonable expectations as evidenced by her periodic pay raises throughout her employment with Kroger. However, even considering Meade's receipt of periodic pay increases, Meade had a documented failure to comply with Kroger's customer service standards which demonstrated her inability to live up to her employer's expectations. *See Fane v. Reynolds, LLP*, 480 F.3d 534, 540 (7th Cir. 2007) (noting that an employee's pay raises and adequate performance of some aspects of the job, but having a confrontational and disrespectful attitude, could not show that the employee was meeting the employer's legitimate expectations).

More importantly, whether Meade was meeting Kroger's legitimate expectations in the past is irrelevant. *Naik v. Boehringer Ingelheim Pharm., Inc*., 627 F.3d 596, 600 (7th Cir. 2010). Meade must show that she was meeting Kroger's expectations at the time that she was indefinitely suspended and terminated, which includes evidence that she did not violate Kroger's policies. *Id*.

The record reflects the following undisputed chain of events: On May 2, 2008, Kroger received a customer complaint concerning the price of a box of cereal and Kroger indefinitely suspended Meade. While Meade disputes the customer's characterization of her behavior, the fact of the matter is, a customer complained at a time when Meade was already on probation, and

therefore she was indefinitely suspended. Meade filed a grievance contesting her suspension, which Kroger then settled and allowed Meade to return to work as of June 28, 2008, on a "last chance basis." After returning to work, Meade's cash register drawer was short ten dollars on July 30, 2008, for which she was suspended. That suspension was rescinded once the union got involved. Meade argues that this recision negated her being subject to the last chance status. Then on August 14, 2008, customers complained about Meade's being rude. Again, Meade may disagree with the customer's characterization of her behavior, but she does not dispute that she interacted with the customers on that day, that they told her that she was rude, that they made sure everyone knew that they were unhappy, and, Meade admitted that she had no reason to believe that the customers did not accurately report their feelings when they filled out the customer comment card. Meade was again indefinitely suspended for receiving another customer complaint. This time, after Meade filed a grievance, Kroger did not give in—citing Meade's demonstrated inability to live up to Kroger's customer service standards as the reason to deny her grievance and terminate her employment.

Thus, despite Kroger's allowing Meade to return to work on a last chance basis, Meade was involved in another incident where customers complained that she was rude and provided poor customer service. Meade does not successfully dispute the truthfulness of these facts. Although Meade engages in unsupported conjecture that the August 14 incident was "staged," Meade's self-serving statements are grounded in mere speculation, and not her personal observations or knowledge that someone in fact concocted the customer complaint incident. *See Whitlock v. Brown*, 596 F.3d 406, 411-12 (7th Cir. 2010); *Mills v. First Fed. Sav. & Loan Assoc. of Belvidere*, 83 F.3d 833, 841-42 (7th Cir. 1996) (noting that a plaintiff's subjective beliefs and

perceptions about defendant's motives are insufficient to create a genuine issue of material fact).

Instead, there is no dispute that Hughes and McCoige witnessed the August 14 incident and that

the customers involved in the incident filled out a comment card and verbally reported to

Redenius that Meade was disrespectful and rude. Meade herself admits the incident occurred,

admits that the customers perceived her as being rude, and admits that the customers then

reported their unhappiness to Kroger. Even assuming that McCoige knew about Meade's last

chance status and assuming that a Kroger supervisor or manager instructed McCoige to give the

customers a comment card, Meade presents no evidence upon which the Court could infer that

the customers were part of some "staged" complaint. Again, Meade's own admissions indicate

that the customers were actually unhappy and reported it to Kroger. Thus, viewing the facts

presented in the light most favorable to Meade and negating her unsupported subjective

speculation that the event was "staged," Meade cannot show that at the time of her adverse

employment action she was performing to Kroger's legitimate expectations.

Finally, there is no evidence to suggest that Kroger ever took Meade off of her last

chance status. Again, only Meade believed that she was not on a last chance status because no

one reiterated her status to her. However, whether or not Meade was subject to the 'last chance

basis' (after her suspension was rescinded for the July 30, 2008 cash shortage), does not

establish that she was meeting Kroger's legitimate expectations in August 2008. Meade

knew—from having signed Kroger's rules and regulations, from having undergone customer

service training more than once, and from having been charged many times for violating

Kroger's customer first strategy—that being discourteous to customers, at any time, could result

in disciplinary action ranging from reprimand to immediate termination. In fact, Meade had

once before been indefinitely suspended due to a customer complaint when she was not on a last chance basis. Therefore, Meade's indefinite suspension and ultimate termination resulting from the customer incident on August 14, 2008, were disciplinary actions which Kroger could take based on its rules, which Meade was well aware. Therefore, when Kroger received a customer complaint about Meade on August 14, she was subject to discipline, including indefinite suspension and termination.

Quite simply, a reasonable jury could not find that Meade met her employer's legitimate expectations. Therefore, Meade's *prima facie* case for age discrimination fails at the second prong of the *McDonnell Douglas* analysis.

### b. Meade fails to establish that a similarly situated employee, who was not a member of the protected class or was younger, was treated more favorably

As to element four of the *prima facie* case, that Kroger treated similarly situated employees outside of the protected class more favorably, Meade alleges that Kayla is similarly situated but was not suspended or terminated.

On summary judgment, the plaintiff must show that she is similarly situated to the employee whose treatment she compares to her own. *Naik*, 627 F.3d at 600. Similarly situated employees must be "directly comparable to the plaintiff in all material respects, which includes showing that the coworkers engaged in comparable rule of policy violations." *Id.* (citing *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365-66 (7th Cir. 2009)). The Seventh Circuit recently clarified the "similarly situated" analysis:

> The similarly situated analysis requires a context-based examination of all relevant factors. *South v. Ill. Environ. Protection Agency,* 495 F.3d at 752–53 (citing *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 404 (7th Cir. 2007) (holding that the

plaintiff failed to show that comparators with the same employment responsibilities and the same supervisor were similarly situated, as the plaintiff failed to show they had similar employment history or had otherwise engaged in similar conduct)). It "ought not be construed so rigidly or inflexibly that it [becomes] a useless analytical tool." *Id.* at 752. Nevertheless, "the comparators must be similar enough that any differences in their treatment cannot be attributed to other variables." *Silverman v. Bd. of Educ. of Chi.,* 637 F.3d 729, 742 (7th Cir. 2011). This generally requires the plaintiff to show that the comparator had the same supervisor, was subject to the same employment standards, and had engaged in conduct similar to that of the plaintiff. *See South,* 495 F.3d at 752. Because the similarly situated analysis does not require numerosity, the plaintiff need offer evidence as to only one similarly situated comparator. *Humphries,* 474 F.3d at 406–07. Overall, "the inquiry simply asks whether there are sufficient commonalities on the key variables between the plaintiff and the would-be comparator to allow the type of comparison that, taken together with the other *prima facie* evidence, would allow a jury to reach an inference of discrimination." *Id.* at 405.

*Eaton v. Ind. Dep't of Corrs.*, 657 F.3d 551, 556 (7th Cir. 2011).

Again, Meade identifies only one younger person that she claims was treated more fairly, that being Kayla. In Meade's deposition and affidavit, she claims that a younger Kroger cashier named Kayla was not terminated after mishandling at least one hundred and seventy five dollars in cash, and yet, Meade was terminated following a ten dollar shortage in her cash register. But Meade's comparison is misguided.

First, and most importantly, Meade was not indefinitely suspended and subsequently terminated for mishandling ten dollars in cash[12] because Meade's suspension for the cash incident was rescinded. Instead, Meade was indefinitely suspended and terminated for receiving another customer complaint on August 14, 2008. Meade confirmed in her deposition that the August 14, 2008, incident is what led to her termination. DE 20-1 at 93.

---

[12]The Court also notes that Meade's attempt to equate Kayla's "potential" loss of cash (which was ultimately recovered), is not the same as Meade's actual loss of cash. In addition, Kayla received a written warning for her incident.

Meade offers no evidence to suggest that Kayla was ever involved in a situation where a customer complained, or that Kayla ever violated Kroger's customer first strategy by being rude or discourteous to customers. Meade does not name any employee who was not suspended or terminated after receiving a customer complaint or violating a last chance agreement. Here, there is no evidence that any employee, other than Meade, ever received a customer complaint. In addition, Meade has no knowledge of other CAR's that were given by Kroger to other front end employees, and she was unaware of anyone else at the Plymouth store who had accumulated as many CAR's for customer complaints as she had accumulated at the store. Simply put, Meade has not identified any Kroger employee, let alone a similarly situated employee, who committed the same policy violation relative to customer service yet was not suspended or terminated.

Therefore, because Meade has not identified a similarly situated employee who engaged in comparable conduct, she cannot establish that such a individual was then treated more favorably. Accordingly, Meade has failed to satisfy the fourth element of her *prima facie* case for age discrimination.

### 2.    *Legitimate, Nondiscriminatory Reason*

Even if the Court were to find that Meade met her burden of proof and established a *prima facie* case of discrimination, her claim cannot survive the next part of the analysis. If she had established a *prima facie* case, the burden would shift back to Kroger to articulate a legitimate, nondiscriminatory reason for Meade's August 2008 suspension and termination. *McDonnell Douglas*, 411 U.S. at 802; *Michas*, 209 F.3d at 694. Kroger has articulated such a reason—Meade was indefinitely suspended by Redenius on account of her receiving another customer complaint on August 14, 2008, and Jenkins, Redenius, Duley, and Hurley agreed that

24

Meade should not be reinstated because of her demonstrated inability to live up to Kroger's customer service standards. This explanation demonstrates a sufficiently legitimate and nondiscriminatory reason for terminating Meade's employment with Kroger.

### 3. Pretext

Because Kroger has articulated a nondiscriminatory reason for indefinitely suspending and ultimately terminating Meade, the burden of proof would shift back to Meade to show that the reason articulated is a pretext for discrimination. *McDonnell Douglas*, 411 U.S. 804; *Michas*, 209 F.3d at 694. Pretext is not shown merely by demonstrating that the employer erred or exercised poor business judgment; instead the plaintiff must establish that the employer did not believe the reasons it gave for the adverse employment action. *Ritter v. Hill 'N Dale Farm, Inc.*, 231 F.3d 1039, 1044 (7th Cir. 2000). Thus, the only question asked is whether Kroger had a legitimate, nondiscriminatory reason for suspending and firing Meade, not whether it made the correct decision. *Naik,* 627 F.3d at 601 (citing *Ineichen v. Ameritech,* 410 F.3d 956, 961 (7th Cir. 2005) ("[I]t is not the court's concern that an employer may be wrong about its employee's performance, or be too hard on its employee. Rather, the only question is whether the employer's proffered reason was pretextual, meaning that it was a lie.")). "If it is the true ground and not a pretext, the case is over." *Naik,* 627 F.3d at 601 (citing *Forrester v. Rauland-Borg Corp.,* 453 F.3d 416, 417 (7th Cir. 2006)). The Court does "not sit as a 'super-personnel department,' weighing the wisdom of a company's employment decisions; rather, [it is] concerned only with whether the employer's proffered explanation was honest." *O'Regan v. Arbitration Forums, Inc.*, 246 F.3d 975, 984 (7th Cir. 2001).

Here, Kroger put forth a legitimate, nondiscriminatory reason for indefinitely suspending and terminating Meade. Whether right or wrong, having received another customer complaint Kroger believed that Meade failed again to abide by Kroger's customer service standards. Meade, alone, without any evidence to support her subjective belief, thinks that Hurley and the other Kroger employees discriminated against her because of her age. However, Meade must do more than challenge the judgment and motives of her superiors through her own self-interested assertions unsupported by record evidence. *Mills,* 83 F.3d at 843. Moreover, personal dislike is unrelated to Meade's age. Even if Meade did not think that the August 14, 2008 incident rose to "the level that they've made it out to be," she does not deny that the incident happened, that the customers were unhappy, and that the customers reported the incident to Kroger. The Court's inquiry is not whether Kroger made the proper decision; it is wether the reasons that Kroger articulated for its decision were honest. The fact that Kroger rescinded Meade's one day suspension for her cash register shortage, and gave her yet another chance, does not allow an inference that Kroger did not honestly believe that the August 14 customers were dissatisfied with Meade's perceived rude behavior, and that Meade failed to follow Kroger's customer first policy.

The undisputed evidence in the record establishes that Meade had again received another customer complaint. Based on the eye witness accounts and the follow-up investigation of the August 14 incident, Meade's past extensive history with customer complaints, and Meade's comments at the grievance hearing, Kroger believed that Meade demonstrated her inability to live up to Kroger's customer service standards. There is no evidence to show that Kroger's reasons for indefinitely suspending and ultimately terminating Meade are incredible or without

factual basis; and, there is certainly no evidence to suggest that the decision was rendered on the basis of discrimination. Ultimately, Meade does not meet her burden of showing that the proffered reasons for her termination were a pretext.

Without a showing of pretext, any indirect claim for discrimination under the ADEA fails. *See Van Antwerp*, 627 F.3d at 299 (7th Cir. 2010). Therefore, even had Meade established a *prima facie* case for age discrimination, her claim still fails because no reasonable jury could conclude that Kroger was not honest in its beliefs, or that Meade was terminated from Kroger because of her age.

**B.** **Meade's Claim for Retaliation in Violation of the ADEA**

Meade claims that Kroger retaliated against her in violation of the ADEA. DE 1 at 6. The ADEA prohibits employers from retaliating against an employee for conduct protected under the ADEA. 29 U.S.C. § 623(d). As with ADEA discrimination claims, ADEA-related retaliation claims may be proven under the direct or indirect method of proof. *Kodl v. Board of Educ. Sch. Dist. 45, Villa Park*, 490 F.3d 558, 562 (7th Cir. 2007).

*1.* *The Direct Method*

Under the direct method, Meade must show (1) that she engaged in statutorily protected activity, (2) that she suffered a materially adverse action, and (3) that the two are causally related. *Barton v. Zimmer, Inc*., 662 F.3d 448, 455 (7th Cir. 2011) (citation omitted); *Kodl*, 490 F.3d at 562. Under the ADEA, retaliation must be a but-for cause of a materially adverse action, not merely a contributing factor. *Barton*., 662 F.3d at 455 (citing *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167 (2009)).

Meade's claim of retaliation fails at the first step of the analysis because she cannot show that she engaged in statutorily protected activity before she was suspended on August 14 and terminated on August 29, 2008. The protected activities are detailed in 29 U.S.C. § 623(d):

> It shall be unlawful for an employer to discriminate against any of his employees . . . , because such individual, . . . has opposed any practice made unlawful by this section, or because such individual, . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

To constitute protected expression, the complaint must indicate that discrimination occurred because of some protected class. *See Kodl*, 490 F.3d at 563.

Meade's retaliation argument is vague, at best. In her Response brief, Meade seemingly suggests that the August 14, 2008 acts of Hurley and Alex Redenius were "demonstrably reactionary to the rights of Meade–to be protected from age-based discrimination–all relative to the termination of Meade's employment". DE 21 at 16. As the Court understands her argument, Meade alleges that Kroger, specifically Paluszewski, was frustrated after Meade was reinstated following the rescission of her one-day suspension in July, 2008, and therefore Kroger "staged" the August 14, 2008 customer complaint incident in retaliation so that Kroger could have a valid reason for terminating her. Meade admitted during her deposition that the only fact supporting her retaliation claim is her belief that the customer complaint of August 14 was staged.

These facts do not show Meade engaging in protected activity. Instead, the undisputed facts show that the first time Meade ever complained of protected activity was when she filed her EEOC charge on October 24, 2008. However, the August 14, 2008 customer complaint, which led to Kroger's August 29, 2008 decision to officially terminate Meade, occurred prior to Meade's filing her EEOC charge.

28

Other than Meade's filing her October 24, 2008 EEOC charge, Meade has not identified any unlawful practice that she opposed, or any other statutorily protected activity that she otherwise engaged in for which Kroger could have subsequently retaliated. In fact, other than her October EEOC charge, Meade admitted that she never complained to anyone that Kroger had discriminated against her on the basis of her age, that she never complained of discrimination by using the means set forth in the employee handbook, and that she never filed a grievance with the union indicating that she felt discriminated against. Because Meade has not established that she engaged in statutorily protected activity for which she suffered an adverse employment action, her claim for retaliation fails as a matter of law. *See Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1122 (7th Cir. 2009) (employer must have actual knowledge of the protected activity in order for its decisions to be retaliatory, and failing to establish this dooms a Title VII retaliation claim under the direct and indirect methods); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 664 (7th Cir. 2006) (holding that an employer's actions against an employee could not be retaliatory where the employee had not first lodged a complaint that constituted a protected activity).

### 2. *The Indirect Method*

Under the indirect method, Meade must show that she (1) engaged in statutorily protected expression, (2) met the employer's legitimate expectations, (3) suffered an adverse employment action, and (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected expression. *Kodl*, 490 F.3d at 562 (citing *Tomanovich*, 457 F.3d at 663). Again, to constitute statutorily protected expression, "the complaint must indicate the

discrimination occurred because of sex, race, national origin, or some other protected class." *Kodl*, 490 F.3d 558, 563 (quoting *Tomanovich*, 457 F.3d at 663).

Meade's retaliation claim fails here too. The only prong of the *prima facie* case Meade can conclusively prove is that she was suspended and terminated, which is an adverse employment action. She cannot show that she engaged in statutorily-protected expression prior to the adverse action or that she was meeting Kroger's legitimate work expectations, and she has not offered any evidence that she was treated less favorably than a similarly situated employee who did not engage in protected activity.

Even if she did establish the *prima facie* case of retaliation, her claim would still fail under the same line of reasoning as stated above–Kroger has articulated a legitimate, nondiscriminatory reason for her August 2008 indefinite suspension and resulting termination, and Meade cannot establish that the reason is pretextual. Therefore, Meade's allegation of retaliation must fail.

## IV. CONCLUSION

Based on the foregoing, Defendant's Motion for Summary Judgment is hereby GRANTED. The Court DIRECTS the Clerk to enter judgment in favor of Defendant and against Plaintiff on all claims, and to treat this case as closed.

SO ORDERED.

ENTERED:___March 12, 2012___

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court